IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2007

BOBBY JOE McCAULEY v. STATE OF TENNESSEE

Appeal from the Circuit Court for Henderson County
No. 06-040     Roger A. Page, Judge

No. W2006-01882-CCA-R3-PC  - Filed October 29, 2007

The petitioner, Bobby Joe McCauley, pled guilty to first degree felony murder and received a sentence of life without the possibility of parole.  In this post-conviction appeal, he argues that he received the ineffective assistance of counsel relative to his mental health condition and whether his plea was knowingly entered.  The trial court denied relief, and we affirm that judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA McGEE OGLE, JJ., joined.

Carthel L. Smith, Jr., Lexington, Tennessee, for the appellant, Bobby Joe McCauley.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Alfred Lynn Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At the guilty plea hearing, the state summarized the facts giving rise to the petitioner's conviction as follows:

> [I]n Henderson County on March the 21st, the year 2005, the victim, Amanda Bateman, was found by a citizen of this county.  Law enforcement was called.
>
> Through investigation it was discovered the suspect, Bobby Joe McCauley.  He was apprehended in Pennsylvania.

He did give a full confession to the homicide, giving details that only the person who did the killing would know, admitting to forcing Amanda Bateman off the road, off the interstate at knifepoint, and that they did have intercourse at knifepoint, and that he eventually did tie a ligature around her neck, causing her death.

In corroboration with that . . . the State would have also produced at trial the Defendant's mother to testify about a phone call she received from her son, the Defendant, admitting to killing the person whose phone he was using. The evidence showed that the phone was the victim's phone.

The victim's vehicle was recovered in the State of Texas with the fingerprints of the Defendant in that vehicle.

DNA also was done on the victim and it did match the DNA of the Defendant.

And all that occurred here in the County of Henderson.

At the post-conviction hearing, the petitioner's trial counsel testified that he was appointed to represent the petitioner in General Sessions Court. He said he was aware of the petitioner's extensive mental health history, which included institutionalizations in Georgia for self-mutilation and hallucinations. He said that he received medical records from the Georgia Department of Corrections stemming from the petitioner's incarceration there but that he did not obtain medical records that predated the petitioner's incarceration in Georgia. Counsel said he recalled that the petitioner may have stopped taking his psychiatric medications shortly before the offense that gave rise to the present case, and he agreed that this would give him reason to investigate the petitioner's mental condition.

Trial counsel testified that he agreed with the prosecutor to send the petitioner to the Middle Tennessee Mental Health Institute (MTMHI) for evaluation. He said he forwarded the petitioner's medical records from the Georgia Department of Corrections to MTMHI. He said that his contact at MTMHI was Larry Southard and that he informed Mr. Southard of the petitioner's medical records. He acknowledged that he also sent Mr. Southard copies of the petitioner's written and videotaped statement to police. He said Mr. Southard requested the videotape to observe the petitioner's demeanor while giving the statement. Counsel read portions of a letter sent to him from Mr. Southard following MTMHI's evaluation of the petitioner. In the letter, Mr. Southard recommended "follow-up services related to competency to stand trial" while the petitioner was in the custody of the Tennessee Department of Correction. Counsel said he was not sure whether the petitioner did receive such follow-up services before he entered the guilty plea. He said he "just obviously felt [the petitioner] was competent and he pled." He said that he may have discussed with the petitioner's family the possibility of having an independent psychological evaluation done on the

-2-

petitioner but that the petitioner's family would not have been financially able to arrange for an independent evaluation. He said that he felt issues regarding the petitioner's mental health history and medication could have been used during mitigation if the case had gone to trial, but he did not think that the petitioner's mental problems rose to such a level to call into question the petitioner's competency or sanity.

Trial counsel testified that he told the petitioner he was in danger of receiving the death penalty if he rejected the state's plea offer of life without the possibility of parole. He acknowledged that the state never filed a notice of intent to seek the death penalty, but he said prosecutors told him "this was a death penalty case." He said that he explained to the petitioner that he would take the case to trial if that was what the petitioner wanted but that he also "emphatically explain[ed]" to the petitioner that the death penalty was a danger they would face if the case proceeded to trial. He told the petitioner that the plea deal was in his best interest. He said the petitioner did not appear to be threatened into accepting the plea offer.

Trial counsel reviewed portions of the guilty plea hearing transcript, including a part in which the trial judge asked the petitioner if he was making a voluntary and knowing plea. The petitioner responded that his plea was "voluntary" and later that he was "making a voluntary plea." Only after further prompting by the court did the petitioner affirm that his plea was also "a knowing plea." Counsel said he did not know why the petitioner twice answered only "voluntary" and not "knowing." He said he did not have any conversations with the petitioner during the plea hearing to address any concerns the petitioner might have had. He said that he had discussed the plea with the petitioner before and that the petitioner did not raise any concerns to him. He said he felt that the petitioner's plea was knowing and voluntary.

On cross-examination, trial counsel testified that before the preliminary hearing, the state had given him discovery related to the petitioner's case. The discovery included a written and videotaped confession by the petitioner. He said he discussed the evidence with the petitioner. He said the state was aware that the petitioner had mental health issues. He said that if the case had proceeded to trial, he would have requested expert assistance and an independent mental health evaluation. He said he discussed this with the petitioner but also explained to the petitioner that an independent evaluation might not result in his avoiding the death penalty. He said the petitioner was convicted of a crime and incarcerated in Georgia, which indicated that he was competent to stand trial and did not receive an insanity verdict.

Counsel testified that prosecutors told him they would seek the death penalty if the case proceeded to trial, although they did not file a notice of intent to seek the death penalty. The state did file a notice of intent to seek a sentence of life without the possibility of parole and listed four aggravating sentencing factors. Counsel said he did not force the petitioner to plead guilty but that he did tell the petitioner he thought the proof against him was strong and that he was likely to receive the death penalty if convicted. He said he thought he did everything possible to get the petitioner the best plea agreement he could.

The petitioner testified that he completed the seventh grade and could read and write. He said he had a history of self-mutilation and hallucinations. He said that he was released from the Georgia Department of Corrections in August 2004 and that, shortly thereafter, he ran out of medications used to treat his hallucinations. He said that his mental health problems began around age twelve or thirteen and that he was hospitalized several times before going to prison in Georgia. He said he told his trial counsel about his extensive mental health history and asked counsel to get his medical records. He said that counsel told his family he would get the records but that the records were never discussed afterwards.

The petitioner testified that he was housed in the Special Needs section of the Tennessee Department of Correction when his trial counsel approached him about entering a guilty plea. He said he was in the Special Needs section because he was hearing voices and was cutting himself. He said counsel told him he would receive the death penalty if he did not do what counsel told him. He said he only entered the guilty plea because he felt threatened by counsel. He said no one ever told him he could possibly receive any punishment other than the death penalty if he proceeded to trial. He acknowledged that he understood his guilty plea and agreed to a sentence of life without the possibility of parole, but he said he thought accepting this plea offer was his only alternative to receiving the death penalty.

The petitioner testified that he did not remember the trial judge asking him if he had any problems with his trial counsel's representation of him. He said he wanted to say something to the judge at the plea hearing but that he was told by jailers and by "the lieutenant" that he could not speak in court. He said that before the hearing, he told the lieutenant that he wanted to fire his attorney. He said that when he tried to talk to the judge, he was "dragged out" of the courtroom by two police officers.

On cross-examination, the petitioner testified that his post-conviction petition was written by a fellow prison inmate. He said that he did not understand everything that was in the petition and that he was "still trying to figure it out." He acknowledged that his petition did not state that he was threatened into pleading guilty. He said he understood the trial judge's questions about whether he agreed to waive his rights, including the right to plead not guilty and the right to have a jury trial. However, he said he still pled guilty because he thought he would be sentenced to death otherwise. He said that he previously pled guilty to charges in Georgia and that he understood his rights at that time.

The trial court denied post-conviction relief, finding that the petitioner failed to prove by clear and convincing evidence that he received the ineffective assistance of counsel. In this appeal, the petitioner contends that the trial court erred because his trial counsel was ineffective in three ways: (1) in failing to develop expert testimony as to the petitioner's psychological state at the time of the offense; (2) in failing to follow MTMHI's recommendations for follow-up services relative to the petitioner's competency to stand trial; and (3) in failing to seek a recess or continuance during the plea hearing when the petitioner was silent about whether he was making a "knowing plea." The

state contends that the trial court's judgment should be affirmed because the petitioner failed to prove his grounds for relief by clear and convincing evidence.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to a general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. When a petitioner claims that the ineffective assistance of counsel resulted in a guilty plea, the petitioner must prove prejudice by showing that but for counsel's errors, the petitioner would not have entered the plea and would have insisted upon going to trial. Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985). Failure to satisfy either the deficiency or prejudice prong results in the denial of relief. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

Related to his first claim of ineffectiveness, the petitioner argues that his trial counsel failed to consult with a psychiatric or pharmaceutical expert to determine the effect that petitioner's failure to take his psychiatric medicines had on his mental state at the time of the offense. He further states that such a determination "would potentially be a clear insanity defense." However, the petitioner did not present proof that he would have had a legitimate insanity defense if counsel had acquired expert assistance. Nor did the petitioner present proof that further investigation into his mental state at the time of the offense would have led to the discovery of any information that would have been helpful to him at trial. Trial counsel did arrange for the petitioner to receive a mental health evaluation at MTMHI, and Mr. Southard's letter to counsel indicated that the petitioner did "not meet the criteria for an insanity defense" and that "[t]herefore, a defense of insanity cannot be supported." We cannot speculate as to what evidence further investigation would have yielded. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1999). Furthermore, the trial court found that the petitioner's trial counsel "considered the necessity for a second evaluation, and after

weighing the facts, determined it was not necessary under the circumstances." The record does not preponderate against these findings. This was not a case where trial counsel ignored the petitioner's mental health issues, as both defense counsel and the prosecutor were aware of the defendant's mental health history, and the defendant's mental health was a factor in plea negotiations. We conclude that counsel was not ineffective in failing to develop further expert testimony regarding the petitioner's mental health.

The petitioner also failed to offer proof that he was prejudiced in regards to his second claim on appeal, that his trial counsel failed to follow recommendations for follow-up services related to the petitioner's competency to stand trial. Mr. Southard also addressed the petitioner's competency in his letter to trial counsel, stating that "[a]fter completion of the competency evaluation, the staff is of the opinion that [the petitioner's] condition is such that he is capable of adequately assisting in his defense in a court of law." While the letter also stated that the staff of MTMHI recommended "follow-up services related to competency to stand trial," the petitioner offered no proof as to what those services were and how he was prejudiced by counsel's alleged failure to follow through with them. The petitioner is not entitled to relief on this issue.

We likewise conclude that the petitioner is not entitled to relief based on his claim that counsel was ineffective for failing to call a continuance during his plea hearing. The petitioner argues that his dialogue with the trial judge regarding whether his plea was knowing indicates his failure to understand the court's questioning and that counsel's failure to recess or continue the hearing at this point "indicates an unequivocal failure to represent the [petitioner] and did not fall within a reasonable range of professional conduct." However, the petitioner has not shown that he would not have pled guilty had counsel called for a recess or continuance. Counsel testified that the petitioner appeared to understand the plea and the court process. The petitioner's claim is without merit.

Based on the foregoing and the record as a whole, we affirm the trial court's denial of post-conviction relief.

---

JOSEPH M. TIPTON, PRESIDING JUDGE